# MICHAEL H. SPORN

ATTORNEY AT LAW
299 BROADWAY
NEW YORK, NEW YORK 10007

TELEPHONE
(212) 791-1200

mhsporn@gmail.com

FACSIMILE
(212) 791-3047

May 11, 2020

Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

MEMO ENDORSED
The Government is directed to respond by May 15, 2020.

SO ORDERED.

*[signature]*

Paul G. Gardephe
United States District Judge
May 12, 2020

Re: United States v. Juan Peralta
Ind. 19 Cr 818 (PGG)

Dear Judge Gardephe:

Juan Peralta respectfully moves the Court for an order granting his release or, in the alternative, a bail hearing to be held this week. Information now exists that was not known at the time of Mr. Peralta's last court appearance "that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of [Mr. Peralta] as required and the safety of the community." *See* 18 U.S.C. § 3142(f). If released, Mr. Peralta will return to his mother's home in Middleton, New York within the Southern District of New York, where he resides with his mother and his adult sister, with electronic monitoring.

On November 20, 2019, Mr. Peralta was presented in this district pursuant on an arrest warrant and Indictment charging him with conspiring to distribute narcotics. At that time the defendant, through counsel, consented to detention without prejudice. In light of the public health crisis that imperils Juan Peralta's physical health, *See* 18 U.S.C. § 3142(g)(3)(A) (listing a person's "physical and mental condition" as one of the release factors to be considered in a bail application), we now respectfully ask your Honor to release Mr. Peralta on a substantial Personal Recognizant Bond (PRB).

It would be co-signed by four financially responsible adults and such other combination of conditions as the Court may deem appropriate. The four financially responsible co-signers would be his two sisters, Rosemary Viruet and Reina Viruet. One works in medical billing for a chiropractic practice. One works in housekeeping at Orange County Regional Hospital. The third is Rosemary's fiancé, Patrick Toro. He works as a repairman for an elevator company in Manhattan. And finally, we have Mr. Peralta's father, Juan Soriano. He has worked in construction for approximately 20 years and is a union member. He lives and works in Manhattan. The other three proposed co-signers all live in Middletown where Mr. Peralta would

stay.[1] Mr. Peralta was residing with his mother in Middletown when he was arrested in our case. He is not a risk of flight.

### I. The COVID-19 outbreak compels Mr. Peralta's release.

We are facing a serious and urgent public health crisis. On March 11, 2020, the World Health Organization officially classified COVID-19, a new strain of coronavirus, as a global pandemic.[2] On January 21, 2020, Washington State announced the first confirmed case of coronavirus in the United States.[3] Only two months later, COVID-19 has infected over 33,018 people across the United States, leading to at least 428 deaths.[4] Those numbers have exploded since then.

The exponential rate of coronavirus infection is unparalleled. The first case of coronavirus in New York State was announced on March 1, 2020. Less than two weeks later, New York State reported 325 positive cases. By March 4, the state had amassed 15,168 confirmed cases of the virus, with 114 deaths.[5] In a five-day period between March 15 and March 20, New York State experienced a 1,064% increase in new confirmed cases of COVID-19.[6] As of March 21, 2020 in New York City, there were 8,115 positive cases and 60 deaths resulting from the virus.[7] On March 13, New York City had only 53 confirmed cases.[8] Today we are … New York has more confirmed cases of coronavirus than any other state in the country. New York City has been the undisputed epicenter of the pandemic.[9]

In response to this public health crisis, Governor Andrew Cuomo declared a State of Emergency in New York State on March 7, 2020.[10] Mayor Bill de Blasio declared a State of Emergency in New York City on March 12, 2020, banning gatherings of over 500 people.[11] On March 20, 2020, Governor Cuomo directed all non-essential workers to work from home,

---

[1] Mr. Peralta's mother also is available to sign for moral suasion. She is not currently working.
[2] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.
[3] *First Patient With Wuhan Coronavirus Is Identified in the U.S.*, The New York Times (Jan. 21, 2020), at https://www.nytimes.com/2020/01/21/health/cdc-coronavirus.html.
[4] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (Mar. 21, 2020), at https://nyti.ms/2U4kmud (updating regularly).
[5] *Id.*
[6] *Watch How the Coronavirus Spread Across the United States*, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/interactive/2020/03/21/us/coronavirus-us-cases-spread.html.
[7] *Coronavirus*, New York City Health (Mar. 21, 2020), at https://on.nyc.gov/39ME7wU (updating regularly).
[8] *Id.*
[9] *Coronavirus in N.Y.C.: Region Is Now an Epicenter of the Pandemic*, The New York Times (Mar. 23, 2020), at https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html?action=click&module=Spotlight&pgtype=Homepage.
[10] *At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus*, New York State (Mar. 11, 2020) at https://on.ny.gov/2TKzIoz.
[11] *Debase Declares State of Emergency in NYC, and Large Gatherings Are Banned*, The New York Times (Mar. 12, 2020).

requiring individuals to maintain 6 feet of distance between each other.[12] The same day, the Federal Emergency Management Agency (FEMA) declared New York "a major disaster."[13]

While adults over sixty years old and people with chronic medical conditions are at heightened risk for COVID-19, young, otherwise healthy individuals are not immune from infection. Data from the Centers for Disease Control and Prevention (CDC) shows that nearly 40% of patients hospitalized from coronavirus were 20 to 54 years old.[14] In New York, 18- to 49-year-olds comprise more than half of all cases in the state.[15] With thousands of confirmed cases in New York City that indicate community spread, we must take every necessary action to protect vulnerable populations and the community at large.

### a. *Conditions of pretrial confinement create the ideal environment for the transmission of coronavirus.*

"Prisons are petri dishes for contagious respiratory illnesses."[16] Inmates cycle in and out of Bureau of Prisons (BOP) pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening or testing. … MCC now… As the chief physician at Rikers Island cautioned, "A storm is coming."[17]

Given what we know about COVID-19, the BOP's quest to contain the infection seems futile. Coronavirus is highly contagious. On average, one person with the coronavirus will infect between two to three other individuals.[18] But public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less

---

[12] *Novel Coronavirus (COVID-19),* New York State Department of Health (Mar. 21, 2020), at https://on.ny.gov/2vfFQvy (updating regularly).

[13] President Donald J. Trump Approves Major Disaster Declaration for New York, FEMA (Mar. 20, 2020), at https://www.fema.gov/news-release/2020/03/20/president-donald-j-trump-approves-major-disaster-declaration-new-york.

[14] *Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S.*, The New York Times (Mar. 20, 2020), at https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html.

[15] *Coronavirus Live Updates*, The New York Times (Mar. 22, 2020) at https://www.nytimes.com/2020/03/22/world/coronavirus-updates-world-usa.html (updating regularly).

[16] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. *See also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[17] *'A Storm Is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jails*, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html.

[18] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[19]

Internationally, prisons have proven ripe for the rapid spread of COVID-19. In China, officials confirmed 500 cases of coronavirus in prisons.[20] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[21] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[22]

On March 20, 2020, the New York City Department of Correction announced that one inmate and seven staff members in the city jails had been diagnosed with coronavirus.[23] One day later, on March 21, 2020, it became clear that no fewer than 38 people have tested positive.[24] At least 58 additional people are being held in contagious disease and quarantine units in the city's jail system.[25] But the cases are not abating. The chairwoman of the New York City Board of Correction urged, "The best path forward to protecting the community of people housed and working in the jails is to rapidly decrease the number of people housed and working in them."[26]

### b. The MCC remains unprepared for a coronavirus outbreak.

Inmates at the MCC—a massive pretrial detention facility housing approximately 700 people—are at serious risk of contracting the virus.[27] The medical care at the MCC has repeatedly failed to adequately address even routine medical conditions, including for Juan Peralta himself.[28] Since Mr. Peralta's remand into custody he has complained of depression and

---

[19] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.
[20] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020), at https://bit.ly/2vSzSRT.
[21] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020), at https://apnews.com/af98b0a38aaabedbcb059092db356697.
[22] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020), at https://cnn.it/2W4OpV7.
[23] *38 positive for coronavirus in NYC jails, including Rikers*, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *See* Exhibit A, Affidavit of Jonathan Giftos, M.D.
[28] *E.g.*, National Association of Women Judges (NAWJ) Women in Prison Committee (WIP) Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016, at https://bit.ly/39JRhdW. Since he was first incarcerated in November 2019, Mr. Peralta

headaches. His requests to be seen have been ignored. Now in this time of crisis, the medical care at the facility has halted entirely.[29]

On March 13, 2020, nearly two weeks after the first confirmed case of coronavirus in New York State, the Bureau of Prisons announced a 30-day suspension of all visits to all federal correctional facilities. But prohibiting visits to correctional facilities is insufficient to stem the spread of illness. "[T]here is no way to stop the daily flow of guards, teachers, food service and healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic."[30]

Because there is currently no vaccine or cure for COVID-19, the primary focus is on preventing the spread of the virus. To prevent new infections, the CDC strongly recommends the following actions: thorough and frequent hand washing, cleaning surfaces with Environmental Protection Agency approved disinfectants, keeping at least 6 feet of space between people, and social distancing.[31]

To date, the MCC has not met even the most basic recommendations of the CDC for preventing the spread of coronavirus. Maintaining six feet of distance from other inmates is all but impossible in a correctional facility where most individuals, including Juan Peralta, are double-bunked in a single cell, sharing a toilet and sink with a cellmate and a common shower with at least sixteen other people. In the days since March 13, the MCC has issued hand soap to inmates in Mr. Peralta's housing unit only sporadically. Because commissary is currently closed, this soap must be used not only for hand washing, but also for showers and washing clothing; no one is allowed to purchase additional soap. Even when functioning, not everyone has access for basic necessities.

In addition to unhygienic living conditions, frequent movement between units at the MCC over the past several weeks promises to continue the spread of the virus. In New York City jails, where there have been at least 38 confirmed cases of coronavirus, the Board of Correction chairwoman stated, "It is likely that these people have been in hundreds of housing areas and common areas over recent weeks and have been in close contact with many other people in

---

has repeatedly encountered difficulty receiving necessary medical attention, notwithstanding multiple requests to the MCC Legal Department.

[29] During a recent eight-day lockdown at the MCC, inmates on one unit reported having been forced to share one toilet, one shower, and one sink among twenty-six people, and were prevented from washing their clothing: prime conditions for the spread, rather than containment, of infectious disease. On other units, toilets overflowed in two-man cells, spreading raw sewage. Inmates with serious medical conditions, including AIDS and anemia, were denied medications or medical care. Female inmates were denied feminine hygiene supplies. No clean drinking water was provided; inmates were forced to drink from their bathroom sinks, from which brown water often ran.

[30] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

[31] Exhibit A, Affidavit of Jonathan Giftos, M.D.

custody and staff."[32] The MCC encounters the same obstacle to cabining the spread. For eight days at the end of February through the beginning of March, the MCC was on total lockdown. During that period, inmates—including Mr. Peralta—report that they were frequently shuttled among various housing units as officers searched for a loaded gun. This movement promises to facilitate infection at the MCC.

The MCC's solution to curtailing all visits for 30 days, extended indefinitely — providing additional phone minutes at no charge—presents yet another public health hurdle. The MCC has given each inmate an additional 200 phone minutes, bringing the total to 500 minutes. But with the extra phone time comes swarms of crowds. The phones in Mr. Peralta's unit remain in constant use and are poorly cleaned, creating more opportunity to spread infection.

With each additional arrest comes increased risk of spreading the virus in MCC. Individuals who are newly arrested and potentially exposed to coronavirus, if they are not symptomatic, will be brought into the facility. There, they are held with the existing population, potentially transmitting COVID-19 to a populace held in close quarters with unsanitary conditions. These conditions are ripe for the spread of infection: The individual who tested positive for coronavirus at the MDC on March 21 first became incarcerated only a few short days before becoming symptomatic.[33] In my practice alone, I have two newly arrested clients remanded into custody at the MCC.

The MCC remains unprepared for an outbreak. The facility does not currently have the ability to test for coronavirus and there are no general screening protocols in place. Only if an inmate self-reports symptoms will they be screened for the virus. If symptomatic, the inmate will be "isolated" in their cell, exposing their cellmate to risk. The MCC has only thirty N-95 masks and no one, including correction officers, is allowed to have hand sanitizer because it is alcohol based. The use of gloves remains discretionary among officers. Given the rapid spread of the virus to date it is clear that the MCC cannot control it. A class action lawsuit was filed on April 28, 2020 outlining in detail the continuing deficiencies and expanding dangers at the facility. *See Cesar Fernandez-Rodriguez, et al. v. Marti Licon-Vitale*, SDNY, 20 Civ. 03315 (ER), with, among other supporting exhibits, the affidavit of Dr. Jonathan Giftos attached to this letter as Exhibit A.

    c. **The federal judiciary has been setting bail conditions for previously detained individuals in light of the coronavirus.**

The judiciary has recently begun to recognize and address this exceptional crisis. On March 12, 2020, Magistrate Judge Orenstein denied a remand application, holding that increasing the population of the Metropolitan Detention Center could present a "danger to the community"—the staff and inmates inside the jail—by potentially bringing the virus into the

---

[32] *38 positive for coronavirus in NYC jails, including Rikers*, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.
[33] *1st fed inmate tests positive for coronavirus*, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

facility. *United States v. Raihan*, 20-CR-68 (BMC) (Mar. 12, 2020). A week later, conditions worsened exponentially.

On March 19, 2020, thirteen days after having remanded defendant Dante Stephens, Judge Nathan reversed herself "in light of circumstances that have changed since the March 6 hearing," namely, "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic." *United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020). In setting bail, Judge Nathan noted that "[a] comprehensive view of the danger the Defendant poses to the community requires considering all factors," including COVID-19. *Id.* Similarly, on March 19, 2020, the threat of coronavirus led Judge Ramos to release a formerly detained individual on bail. *See United States v. Santiago Ramos*, 20-CR-04 (ER). There is a growing string cite of favorable cases in this District alone counsel can make available if the Court deems it helpful. In the throes of this public health crisis, the Court must release Juan Peralta to protect his physical health.

## II. The Sixth Amendment demands Mr. Peralta's release.

The conditions of confinement at the MCC have gutted Juan Peralta's Sixth Amendment right to the effective assistance of counsel. Until he is released, Mr. Peralta will continue to suffer violations of his constitutional rights.

The Sixth Amendment right to counsel is the cornerstone of our adversarial system of criminal justice. "The right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system." *Federal Defenders of New York, Inc. v. Bureau of Prisons*, Docket No. 19-1778 (2d. Cir. Mar. 20, 2020). In recognition of this vital right, BOP regulations instruct that detention center wardens "*shall provide* the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis." 28 C.F.R. § 551.117(a) (emphasis added).

A detention facility therefore violates the Sixth Amendment when it "unreasonabl[y] interfere[s] with the accused person's ability to consult counsel." *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001). Unreasonable interference requires a showing far less alarming than the one present here. In *Benjamin*, the Second Circuit held that New York City correctional facilities violated the right to counsel when defense attorneys "routinely face[d] unpredictable, substantial delays in meeting with clients" and were "forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client." 264 F.3d at 179. These circumstances, where the Second Circuit refused to dissolve a consent decree providing judicial supervision of legal visitation in City correctional facilities, are far less jarring than those Mr. Peralta has been forced to endure.

For more than a month, Mr. Peralta has borne a complete disruption of his right to counsel. I received a written plea offer from the government on February 26, 2020. I went to see Mr. Peralta the next day to discuss it. On February 27, 2020, counsel actually was in the MCC waiting for Mr. Peralta to be brought into the attorney client visiting room when correction officers abruptly directed all counsel to leave immediately culminating in a total lockdown. The

Case 1:19-cr-00818-PGG   Document 46   Filed 05/12/20   Page 8 of 10

MCC entirely shut its doors to legal and social visitation for eight straight days. During that time, Mr. Peralta was confined to a single jail cell 24 hours a day. He, like all inmates, was denied phone calls to his attorney and lacked computer access for more than a week. This is inconsistent with the constitutional right to counsel. In *Wolfish v. Levi*, the Second Circuit held that the MCC "severely constrained" an inmate's "access to legal counsel" where dedicated attorney visiting hours were limited to two hours a day, and most attorney visits were "made in the general visiting rooms during visiting hours thereby entailing long delays, limiting the attorney's time with his client, and totally vitiating confidentiality." 573 F.2d 118, 133 (2d Cir. 1978) (holding the), *rev'd on other grounds,* 441 U.S. 520 (1979).

In all of March, April and May, there was a brief, three-day window during which counsel could communicate with clients in person. On March 10, 2020, the MCC reopened for counsel visits. Again, I went to see Mr. Peralta the next day, March 11. Two days later, on Friday, March 13, in response to the public health crisis posed by COVID-19, the BOP issued a notice that all visits in all federal correctional facilities would be suspended for at least 30 days – and of course that suspension continues to date with no end in sight.

With the onset of the pandemic, counsel has been able to visit with Mr. Peralta exactly once since mid-February to the present. There is no reasonable expectation of meeting in the foreseeable future. This disruption in the fundamental right to access to counsel is causing a palpable interference in the resolution of this matter. As mentioned, we have a written plea offer from the government. The Indictment charges a §841(b)(1)(A) conspiracy. Mr. Peralta's case likely will result in a §841(b)(1)(C) plea with the culmination of discussions regarding any applicable adjustments. No doubt this would have been accomplished months ago but for the difficulties in communicating. While it may be accurate that attorney and client may not be able to meet physically, if Mr. Peralta is confined to the boundaries of his mother's residence, his custodial status will enable unfettered access to counsel to an extent that is not currently possible.

Since the suspension of counsel visits on March 13, the MCC reports that it has not received a single request from any defense counsel that they deem appropriate for an in-person visit. Counsel had one opportunity to speak on the telephone with Mr. Peralta on April 24 for a limited time. And the defense community, through the auspices of the federal defender's office, is attempting to arrange videoconferencing with the MCC going forward, but that is more aspirational than functional to this point.

As the public health crisis rapidly evolves, so too does the judiciary's perspective on release. On March 18, 2020, Chief Judge McMahon granted an application for bail based on compelling reasons related to the current health crisis. Defense counsel had argued that "[a] complete cessation of visits at this critical time of preparation would make it impossible to adequately prepare for trial…." *United States v. Hudson*, 19-CR-496 (CM) (Mar. 13, 2020). Five days earlier, she had denied the request. *Id.* This extraordinary moment requires judicial intervention to safeguard Mr. Peralta's constitutional rights.

### III.   The Bail Reform Act requires Mr. Peralta's temporary release.

When an individual is in custody, the Bail Reform Act "permit[s] the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the

8

extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). There is no greater necessity for the preparation of a "person's defense" than access to counsel. And there is no more "compelling reason" than a person's physical health.

Indeed, Judge Nathan recognized that "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason [to release the Defendant] under 18 U.S.C. § 3142(i)." *United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020) (releasing the defendant concluding that in light of changed circumstances, Mr. Stephens does not pose a danger to the community). *See also United States v. Perez*, 19-CR-297 (PAE) (Mar. 19, 2020) (concluding "compelling reasons exist for temporary release of the defendant from custody during the current public health crisis").

In *United States v. Rodriguez*, the Court held that with respect to an accused's need to consult with counsel, "Section 3142(i) (3) reaches above the minimum" standards set by the Sixth Amendment. 2014 WL 4094561, at *4 (W.D.N.Y. 2014) (Scott, M.J.). The subsection's plain text "mandates the removal of any impediment to 'private consultations' [between attorney and client] that are qualitatively and quantitatively 'reasonable.'" *Id.*; *cf. Falcon v. U.S. Bureau of Prisons*, 52 F.3d 137, 139 (7th Cir. 1995) ("Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, [the court] has the statutory authority to protect [defendant's] access to counsel.").

At the very least, the Bail Reform Act demands that Mr. Peralta be released for the duration of the coronavirus outbreak.

**Conclusion**

The Court cannot ignore the restriction of Mr. Peralta's constitutional right to counsel and the substantial threat incarceration poses to Mr. Peralta's physical well-being. As the Second Circuit recently opined, "the careful balancing of needs and rights that [ ] emergencies require is likely not best achieved by protracted and contentious litigation after the fact, and certainly not at the appellate level. It requires real-time, comprehensive solutions, reached in cooperative institutional discussions." *Federal Defenders of New York, Inc. v. Bureau of Prisons*, Docket No. 19-1778 (2d. Cir. Mar. 20, 2020) ("direct[ing] the District Court [to help] ensure that the Federal Defenders have meaningful, continuous access to their clients either in person or by remote access pending adjudication of [legal claims against the MDC, including Sixth Amendment violations] as these claims may be amended to address similar issues of access [to counsel] arising during the current public health emergency [COVID-19]").

We are aware that your Honor has considered, and denied, similar requests by co-defendants. Mr. Peralta's limited role in the charged conspiracy supports the view that he does not present a risk of flight or a danger to the community such that no conditions for release can be set that would assure both the safety of the community, and his own safety during the life of this pandemic. Accordingly, I respectfully request that the Court issue an order releasing Juan Peralta on bail. In the alternative, I respectfully request a bail hearing this week for Mr. Peralta.

Thank you for your consideration of this matter.

Respectfully submitted,

Michael H. Sporn

MHS/ss
CC: Jacob Warren, Esq.